JOHN A. HOLMES *versus* ELBRIDGE GERRY.

A count in case, under c. 136 of Public Laws of 1862, substantially alleging that, prior to a day named, the defendant had, at various times, loaned to plaintiff large sums of money, amounting to $3100, and, on said day named, he did take and receive from the plaintiff $2500, as usurious interest, may be amended by setting forth specifically the several sums loaned, together with their respective dates, and the several sums received as usury upon each loan, if the aggregate amount of usurious interest does not exceed that in the original count.

To enable the plaintiff in such action to recover of the defendant money alleged to have been paid as usurious interest upon a loan, it must appear by a preponderance of evidence that the plaintiff was legally liable to the defendant for the money loaned.

Where the proof manifestly fails to establish such liability, a verdict for the plaintiff will be set aside.

ON EXCEPTIONS and MOTION to set aside the verdict as against the law, the evidence and the charge of the presiding Judge.

CASE, under c. 136 of the Public Laws of 1862, to recover back usurious interest.

The writ was dated May 20, 1865. The presiding Judge, against the defendant's objection, permitted the plaintiff to amend the eleventh count alleging that, — "Whereas the said defendant, prior to the fifth day of July last, had at various times loaned to the plaintiff large sums of money, amounting in the whole to a large amount, viz., three thousand one hundred dollars, and the said defendant, at said Portland, on the fifth day of July last past, in violation of law, and contrary to the provisions of the statute in such case made and provided, did demand, take and receive of the said plaintiff a large sum of money, as excessive and usurious interest on said loans, to wit, the sum of twenty-five hundred dollars, and the plaintiff did then and there, as a consideration for said loans and the use of said money, pay to said defendant, in lawful money, said sum of $2500 over and beyond the legal interest on said loans, and in excess of the legal interest thereon, whereby and by force of the statute, an action hath accrued to the plaintiff to have and recover of said defendant said sum of $2500, with legal interest thereon from said fifth day of July last past," by alleging as follows : —

" That the said defendant, at said Portland, on the twenty-fifth day of April, A. D. 1856, having loaned and advanced the plaintiff money on that date, upon a certain contract or promissory note of that date, for the sum of five hundred dollars, signed by one Hiram H. Dow, for that purpose, at the special instance and request of the plaintiff, and

of which request said defendant then and there had notice, did then and there take and reserve upon said contract or note, of and from the plaintiff, a rate of interest exceeding that established by law, amounting to the sum of thirty-four dollars, and in violation of law and contrary to the statute in such case made and provided, and, on the seventeenth day of August, A. D. 1856, at said Portland, in a contract made between plaintiff and defendant, of and on three certain contracts or promissory notes of that date, each signed by said Dow, for that purpose, at the special instance and request of the plaintiff, and of which said defendant had then and there notice, one of said notes amounting to the sum of six hundred and twenty-three dollars, payable in three months, and one of said notes, amounting to the sum of six hundred dollars, payable in three months, and one of said notes, amounting to the sum of six hundred dollars, payable in four months, — and all of said notes being made and given as aforesaid, and received by said defendant of said plaintiff in substitution and renewal of said first described contract and promissory note, and on certain other money then and there loaned and advanced by said defendant to the plaintiff, said defendant did then and there take and reserve, in said last named contract and three promissory notes, a rate of interest exceeding that established by law, amounting to the sum of eighty-five dollars, fifty-nine cents, in violation of law, and contrary to said statute; and, on the 13th day of November, A. D. 1856, in a certain other contract of loan of money, made by the plaintiff with the defendant upon two other certain promissory notes of that date, signed by said Dow at the special instance and request of the plaintiff, for that purpose, and of all which said defendant had notice, — one of which said notes being for the sum of six hundred and twenty-three dollars, payable in four months, and one of said notes being for the sum of seven hundred dollars, payable in four months, and given by the plaintiff to said defendant in renewal and substitution of and for his last previously named contract with the defendant, and of and for two of said last

three named notes, to wit, of said notes given as aforesaid, for the sums of $623 and $600, each payable in three months from date, did then and there take and receive of said plaintiff on said contract, and in said two notes, bearing date as aforesaid on said 13th day of November, 1856, a rate of interest exceeding that established by law, amounting to the sum of seventy-four dollars and fifty-four cents, in violation of law and contrary to said statute,—the same sum being in addition to the unlawful interest previously reserved as aforesaid; and did, on the twentieth day of December, 1856, then and there at said Portland, in a certain contract made by the plaintiff with the defendant, and upon a certain other promissory note, bearing said last named date, for the sum of six hundred and forty-eight dollars, signed by said Dow at the request of the said Myers, for said purpose, and of all which said defendant had notice, and in renewal of said note for six hundred dollars, dated August 19th, 1856, as aforesaid, and payable in four months from date, to be and recover of said defendant a rate of interest exceeding that established by law, amounting to the sum of thirty-six dollars, in addition to unlawful interest received as aforesaid, and in violation of law and the statute aforesaid; and did, at said Portland, on the eighteenth day of March, A. D, 1857, in a certain other contract made by and between the plaintiff and said defendant, of and on three other certain promissory notes, signed by said Dow at the request of the said defendant, for that purpose,—and all of which the defendant then and there had notice,—bearing said date and given and received of said plaintiff by said defendant, in renewal and substitution of and for the last previously named contract with the plaintiff, and of said three notes last described above, to wit, for the sums of $623 and $700 and $648, and which said notes, so substituted and renewed, were each and respectively for the sum of $709,56, did take and receive of the plaintiff a rate of interest exceeding that established by law, amounting to the sum of one hundred eighteen dollars and twenty-six cents, in violation of law

and of the statute aforesaid, in addition to the said several sums of unlawful interest aforesaid, and said defendant, at said Portland, on the eighteenth day of July, 1857, by and in another contract made by and between said plaintiff and said defendant, and of and on three other certain promissory notes bearing said date, and signed by said Dow at the request of the plaintiff, for said purpose, and of all which said defendant had notice, received by said defendant, in renewal and substitution of the three last described contract and promissory notes, and being respectively for the sum of eight hundred and nine dollars, did take and reserve of and from the plaintiff a rate of interest exceeding that established by law, amounting to the sum of two hundred and twenty-five dollars, in violation of law and contrary to the statute aforesaid, in addition to the several sums of unlawful interest above named.

"And said defendant, on the eighteenth day of August, A. D. 1861, at said Portland, in and by a certain other contract made and entered into by said defendant with the plaintiff, for the amount of four thousand one hundred and eighty dollars, partly in renewal and substitution of and for said last above described contract and said three promissory notes, so signed by said Dow, and for and in renewal of another certain promissory note for five hundred dollars, dated the twenty-seventh day of June, A. D. 1857, signed by said Hiram H. Dow and indorsed by one John G. Myers, and payable in sixty days from date, and paid by said defendant at the request of the plaintiff, did take and reserve a rate of· interest of and from the plaintiff exceeding that established by law, amounting to the sum of six hundred and twenty-five dollars and fifty-three cents, in violation of law and contrary to said statute, and in addition to the several sums of unlawful interest beforementioned.

"And that said defendant, on the fifth day of July, A. D. 1864, at said Portland, in a certain other contract for and amounting to the sum of six thousand dollars, then and there made by and between the plaintiff and said defendant,

in substitution and renewal of, and to carry out the aforesaid last named contract of loan, and for money advanced by said defendant to the plaintiff as aforesaid, did then and there take and reserve and receive in money from the plaintiff, to wit, in the sum of six thousand dollars on said last previously described contract, dated the eighteenth day of August, A. D. 1861, a rate of interest exceeding that established by law, amounting to the sum of three hundred and seventy-five dollars and ninety-eight cents, in violation of law and of the statute aforesaid, and in addition to the several sums of unlawful interest previously named, making in all of said several sums of interest so taken and received of the plaintiff by said defendant, and in said several times, and in said renewals and substitutions of said several loans and contracts aforesaid, a rate of interest exceeding that established by law, amounting in the aggregate, as aforesaid, to the sum of fifteen hundred and seventy-four dollars and ninety cents, whereby and by force of the statute in such case made and provided, an action hath accrued to the plaintiff, to have and recover of said defendant said sum of fifteen hundred and seventy-four dollars and ninety-eight cents, together with lawful interest thereon from said fifth day of July, A. D. 1864, on which day, as the plaintiff avers, he paid said sum of money on the contracts aforesaid, for unlawful interest, to the defendant."

*Hiram H. Dow,* called by the plaintiff, testified:—I have known Mr. Holmes thirty or forty years; he is a brother-in-law of mine. I have known Mr. Gerry a dozen or fifteen years. I gave a note April 25, 1856, of $500, for four months, for the benefit of Mr. Holmes, at his request. I did not see any money pass; I only know I signed the note for his benefit. The rate of interest was talked over; Mr. Gerry generally figured it at two per cent. a month. On August 19, I gave notes, at the request of Holmes, payable to Mr. Gerry; I gave a note on three months for $623, another on three months for $600, and on four months for $600,— the three of the same date. I have

Holmes *v.* Gerry.

no recollection about the money. I cannot explain them in any other way than that they were for the benefit of John, to go to Mr. Gerry; two per cent. a month was the interest upon these notes taken and reserved. On Nov. 13, 1856, I renewed the note of $623, on four months, and gave another $700 note, for four months; these were given on renewal of two of the three months notes, dated Aug. 19, 1856. In December 20, I signed a note to renew the $600; I signed a note for $648, on four months; I did not see any money paid when these notes were renewed; the interest was added to the notes that were renewed. In the year 1857, March 18, I signed three notes on four months, to renew the old ones to Mr. Gerry, of $709,56, each, amounting to $2128,68, dated March 18, on four months, all of them. I have no doubt that these notes were given for the renewal of the notes of Nov. 13 and Dec. 20. When the notes matured, I gave a new one with the interest added. In July, 1857, I gave three notes, of $809 each, on seven months, all the same amount, same date, same time; I have no doubt they were given to renew the notes of March 18. When these notes were given, Gerry wanted a mortgage, — the notes were increasing very fast; I did so at John's request. It was property I took from him to save me harmless for indorsing for him. My name was upon another note, — a $500 note, called the Porter note. Mr. Porter held it; it was negotiated to a broker, dated June 24, 1857, on sixty days; that note was not given to Mr. Gerry. When the notes became due, Mr. Gerry said if I would give him the deed outright of the property, (he had then only a mortgage,) he would take up that note, and release me; he did so; I never heard from it afterwards. The property that I was to give him a right-out deed of, was John Holmes' homestead, on Stevens' Plains, — the same property that I had previously mortgaged to Mr. Gerry. Mr. Gerry would do that if I would give him the deed; and he would give back John a writing that, when he paid what was due, he would give a deed to him; he said he should prefer not to

do it then, as that would give it the form of a mortgage, but, after a short time, he would give him a writing that he would do that. It was a part of the arrangement between Gerry, Holmes and myself, that Gerry should take that note up, and hold it as a claim against Mr. Holmes, secured by this real estate. All these notes were given by me ; all the transactions about these notes were performed by me solely for Holmes' benefit. John G. Myers did not request me to sign any papers for him, and I did not sign any at his request. During this period I had frequent interviews with Mr. Gerry, at his office and other places, and frequently conversed in reference to these matters between himself and Mr. Holmes ; we talked as friends, very freely ; he often said to me he did not think I would lose anything, — that Myers was likely to be successful, and, if Myers was successful, he thought John would get his pay from Myers, for the matters between us. Mr. Gerry certainly knew that I was doing all this for Mr. Holmes, and not for my own account. He and John fixed up the matters ; I used to go there, and fix up the notes.

*Cross-examined.* — I was the promisor in all these notes I have spoken of, — they were all made payable to Elbridge Gerry ; I am not positive that John Holmes' name was on any of these notes ; I should say it was not ; I am very sure it was not on ; he might put his name on after I signed it. This paper, dated April 19, 1860, has my signature. I should doubt if I was present at any negotiation between Mr. Holmes and Mr. Gerry. I could not say what the bargain was. I know I went at his request ; I think I was not present at any of the negotiations of any of these notes. I heard the rate of interest talked over, at the time the notes were cast ; I was present at the signing of the notes. Mr. Holmes would ask me to go into Mr. Gerry's ; he supposed we should have to renew. I signed them all at his request. I never did anything in reference to the notes except to sign them. How I know that it was two per cent. per month is, that I saw them make the figures. I can't state

what was said about it; I can't remember the particulars. I did not have my own notes out except for him. When this note came due, in August, I presume it was renewed; I know they were renewed; my book says they were. When I gave new notes in August, they were computed at two per cent. per month. My book says that I signed three notes in August, for $623, $600 and $600. I signed for renewal. I believe these notes were ultimately paid in 1864; I know something about it. It strikes me that in 1857 we settled with him, and he looked to the property and John; they were paid when the quit-claim deed was given, so far as I was concerned. I think John did it all before I saw Mr. Gerry; I went to see Mr. Gerry about it afterwards. The Porter note was $500; no interest. Mr. Gerry took a deed of the property, and looked to the property and John for the pay; I understood Gerry took up that note; he promised to; I did not see it. That Porter note was made payable to Myers, and Rich negotiated it. I don't know anything about Porter. Ilsley presented it to me for payment; I don't know who was the owner of it; it was at L. Cummings' office. I don't know that there was any name on the notes to Gerry but mine. I had a place of business in Portland street, in this city, at that time, where I made my stopping place. I think Gerry did not come to my stopping place to get these notes renewed; I think I invariably went to his place of business. I think we never signed any of them out of his office. I suppose the money to pay the Porter note came from Mr. Gerry. When this Porter note was payable I lived in Westbrook, about a mile from Deering's house, out on the Saccarappa road.

*Re-direct.* — You are right in understanding me to say that the Porter note was signed by me at the request of Mr. Holmes, and for his benefit; that Holmes negotiated with Gerry for the arrangement of that note; Mr. Holmes requested me to go to Gerry's office; it was there said that Gerry would take care of it if I would give him a right-out deed of that property; he said he had made such an arrange-

ment with John; it was made by him; I am not positive whether Holmes was there. I wanted Mr. Gerry to give me up my notes; Mr. Gerry said he would make a memorandum, and, if anything should happen to him, it will be understood what was the condition of the notes; at any time John and I would come in, he would settle it up, but he would prefer to have Myers come in also; he said he had some matters with Myers; he would prefer all three together; he would settle up and give up the notes; I never got those notes; Mr. Gerry told me he had lost them, and gave me a memorandum. Subsequently to the time of giving this mortgage, Mr. Gerry once, or more than once, anticipated me in making a request for those notes, and said he would give them up; I did subsequently ask him to give them up in 1863 or 1864; I was at his house; he gave me something to cut the notes. I have no recollection of ever seeing Myers at Gerry's office, at any of the conversations between Gerry, Holmes and myself. At the request of Mr. Holmes, I signed the note for $2426,49,—about the same amount as the three notes that I gave Mr. Gerry, combined; it was signed by John G. Myers, and I indorsed it, at the request of Mr. Holmes; it was dated the 18th of July, 1857; it was given for $2426,49. I think Mr. Holmes gave Mr. Gerry $4000 of York and Cumberland bonds, as collateral; I don't remember all the particulars. Mr. Myers gave the collaterals. Holmes and Gerry had talked over matters about Myers' inability to pay; I heard the conversation between them and participated in it, — that they should have something tangible from Myers to show that he was indebted so much; they thought they better make up a note of that kind; Myers would be likely to sign it. This arrangement was exclusively for the benefit of Holmes, to get security for him. I so understood it from Gerry and Holmes, both.

*To the Court.*—This is to show the amount of Myers' liability to Holmes. According to that agreement, that note was given for the special benefit and security of Holmes. I

I so understood from Gerry and Holmes, both; we were all present. Sometime in the summer of 1864, I went with Holmes to Gerry's house. The substance of the conversation was, Holmes offered to pay Gerry what Gerry claimed he owed him; Gerry had already fixed upon the sum. Holmes paid him $6000,—both appeared to be satisfied. There was no conversation about the amount to be paid. It had been previously arranged. Gerry delivered him a deed of his estate in Westbrook,—the same property I had previously conveyed Gerry. I have no doubt that the paper shown me is the paper; it is dated July 5; I think that was the date of the paper. 'Received of Hiram H. Dow one dollar, in full of all demands, notes and accounts.' It was on that date that the $6000 payment was made. The $6000 was paid in a certified bank check.

*Cross-examined.*—On the 18th of July, in which Myers gave his note for $2426,49, about the same time that I gave the three notes for $809 each, it was a part of the same transaction; his note was for $2426,49; my three notes for $809 each, would come to $2427. I don't know where the discrepancy is. It was outside of Holmes' and my notes that we had arranged with Gerry; it was connected with it. I could not say about the precise date; I don't remember these were the precise notes. I should not have stated yesterday that it was for these particular notes; it was given to secure whatever indebtedness I was under to Gerry,— whether $2427, I don't remember. I think the deed was made; I saw the check given and the deed delivered; he wanted me to see that he paid it, and I did so. I don't recollect that I signed any other papers; I don't recollect that I gave Gerry any paper. [Paper shown.] I signed that paper, dated July 5, 1864; I presume it was signed at the time,—it was dated Portland, July 5, 1864,—a receipt in full of all demands, and especially for discharge of Y. and C. bonds,—said bonds having been held by him as collateral, and sold by public auction, by H. Bailey. I have no doubt I gave that paper at that time; I have no recollec-

tion about it. To the question, whether I recollect that, at the same time, a duplicate receipt precisely like this, was written and handed to Holmes for him to get John G. Myers to sign, and bring back to Gerry,—I answer, it may be so, but I have no recollection of it; it was a matter I never expected to hear from again, and I did not pay attention to it. In relation to this $2426,49 note that I said I signed, I indorsed it; I could not say where it was left; the arrangement was, that Gerry was to have possession of it; I don't know what was done; it was indorsed in Gerry's office. If I indorsed one, I could not say that it was secured by those $4000 Y. and C. bonds,—if secured by collaterals, it was by these bonds. Robinson, clerk to Myers, brought those bonds there. I understood them to be Myer's bonds; I suppose Myers had the money. So far as I was concerned, I looked to nobody but Holmes. I never saw the money; I heard Holmes say that Myers had the money; he raised the money for Myers as I understood it. The understanding was, that Holmes was holden to pay the money to Gerry. I think he did not give him any paper of that kind. It might have been obtained at the bank on Gerry's indorsement; I do not distinctly remember. I did not intend to state yesterday that they were renewed three or four days before they fell due; I had the impression that sometimes they run past a little. Gerry spoke to me several times about having these notes renewed to get money to pay the other notes. It may be, that Gerry told me where he got the money from, but I don't remember; I could not say that he told me how he obtained it.

When the quit-claim deed was given, it was only to be for security to Gerry for the amount due; I was to be released. I understand that Gerry took the property to secure him and agreed to give Holmes a deed back when he paid him what was due. I don't recollect that Gerry had any claim against John A. Holmes, except these notes. I recollect that we had a conversation at Gerry's house, in 1860, in the spring, between Holmes, Gerry and myself. Gerry

said that he did not consider that I was released from obligation from that arrangement; he wanted me to take up the notes and take back the property. I think that, in 1860, Gerry wanted me to take these notes, pay him back his money and take back the property; I refused; Holmes was present. I refused, because we made an arrangement that I was to be clear from it. John C. Gerry was there. [Note of April 25 shown.] I wrote it myself, as well as signed it.

*Direct.* — He retained all the notes; he said he would keep them till he and I and John made a settlement; he said he would give them up at any time when John and I would come in and end matters. I was acquainted with the value of the property described in the mortgage and quit-claim deeds from me to Gerry; the fair value, at the time I made the conveyance to him by quit-claim, was four or five thousand dollars; it was rated at $10,000; it was talked of as a hotel stand, and rated pretty high; they called it $10,000.

[A receipt, signed by witness July 5, 1864, was put in.] I did not claim an interest in the York and Cumberland consolidation bonds, referred to in this receipt; I did not own them; I never held them as security. I had no conversation with Myers at all; John Holmes made the arrangement. The bonds were never in my hands or in my control, and I never had anything to do with them, — that fact was known to Gerry.

*Cross-examined.* — $4000 in bonds was deposited for the 2400 (and odd dollars.) I suppose the other thousand dollars came from Myers; I don't know what note it was connected with. I gave the Porter note running to Myers.

*John A. Holmes,* plaintiff, testified : — Mr. Gerry was my counsel in 1853. The account that I settled with him for professional services commenced in 1853. The first negotiation with Gerry for the loaning of money was in the Spring of 1856; it was made for Myers' accommodation. Myers owed me a large amount and he wanted me to help him to money to carry on his lawsuit; and, if he succeeded

in that he would pay me up my claim. I asked Gerry at his
office about it. No one was present when I made the ar-
rangement with Gerry in reference to the loan of April 25,
1856, the $500 note. I was to give him Hiram H. Dow's
note. I had $25,000 or $30,000 in there; to nurse that
along I wanted to help Myers to some money to carry on
his suit. My credit was not good. I gave Dow a deed to
indorse my notes for that purpose. In pursuance of the
agreement between myself and Gerry, I procured Dow's
note and delivered it to Gerry; the interest discounted on
that note was two per cent. per month or more; I think it
was more. At a subsequent time in that year, I negotiated
a further loan of Gerry. I think this first note was running
three or four months, and that, on or before that time, we
arranged that note and got two other loans. The amount
of the notes was a good deal more than the money we got.
The notes, I think, were $600 apiece, two of them; the
other one, more than that. One was to renew the $500
note; the other, two new loans. He never let me have any
money less than two per cent., and sometimes more. These
notes were renewed again at or about their maturity. There
never was any more money paid after the first three notes
were given, Aug. 19, until they resulted in the three notes
amounting to $2427. The three notes were renewed in
1857, about the 18th of March, for $709,56 each. They
were renewed whenever it was necessary. About July 18,
1857, when these notes were renewed for the last time,
Gerry did not want to advance any more money, unless
Dow would give him some security. It was my property;
nobody else had any claim on it but Dow, and that was for
being bondsman for me. A mortgage was made to Gerry
at my request. Myers wanted more money. I got Dow to
give John (Myers) his note for $500, for him to go into the
market. Myers gave Rich his brother-in-law, the $1000
Y. & C. bond as collateral, for my benefit, and it was ne-
gotiated. Cummings afterwards had this note. I wanted
Gerry to take it up; he said if I would get Dow to give

him a right-out deed of the place, he would take this note
up; I got Dow to do it. This was my property that had
been mortgaged prior. Gerry agreed that he would take
up the note, and would give me a writing back to release
the property to me again, by my paying him the amount
due. In connection with this settlement, one inducement I
had to let Dow quit-claim to Gerry was, that he should re-
lease Dow from all his liabilities; upon that, I consented to
do it, upon Gerry giving me a bond to release the property
upon my paying the debts. I expected he would release
Dow and then give me a bond, but he said it would make it
the same as a mortgage; he said he would give it at some
subsequent time, some future day; so that he refused to
give me a bond at that time, and never did give me one.

[Paper shown witness, marked " A," dated August 18,
1861.] " It was signed by Elbridge Gerry and myself, and
was taken up July 5, 1864." [The paper read.] " My
impression is, that the $4180 took in these three notes of
$809 each; it took in the $500 Porter note; two per cent.
per month interest was included upon these notes; we made
that settlement and agreed to call it twelve per cent. per
annum. Previous to this, the interest on the notes was two
per cent. per month.

That note dated Portland, May 22, 1863, for $732, on
six months from date and interest, was given in the settle-
ment of his accounts against me for professional services.
There was a compromise, deductions made, and some other
little matters settled. He took my note for the $732; $632
was the result of the settlement.

Gerry & Robinson's bill, commencing 1859 and extend-
ing down to June 15, 1861, for $145, receipted by Gerry
& Robinson; this bill was in addition to the other. I never
gave any note on that. I think it must have been settled
in 1864.

Gerry kept hurrying me up about the matter; he told
me if I would give him $6000 in cash, he would release my
property and give me up these notes against Myers and the

rest of us; that was prior to the 5th of July, 1864. I had an interview with Gerry previous to July 5, 1864, and he told me he would release my property and give up all these documents if I would pay him $6000, and nothing less. I went and made arrangements to get my money. I gave the check to Gerry and got a deed of the property. I got a certified check that he had deposited for his credit, $6000, in cash. I carried that check to Gerry myself; Dow went with me. I received paper 'A,' Dow's three $809 notes, and mine of $672, the same day that I paid him $6000. He gave me a deed that day. The history of the transaction about a note for $2426,49, signed by Myers and indorsed by Dow, as between me and Gerry, is this:—I had been advancing Myers this money and had got nothing from him to show for it. I wanted to get Gerry's advice how to get something. He told me he would help me do it. I got Myers to go to Gerry's. We got Myers to leave $4000, in bonds. We got Dow to indorse the note, so as to make John more anxious to pay it when it was out, and he did so. It was not for Gerry's benefit at all; it was for my own entirely. He had ample security for his money three times over. Before doing this I had conversations with Gerry upon the subject. I got it upon his recommendation and advice. The note was given for my own benefit and nobody's else, and the bonds were pledged for my particular benefit. Gerry never asked me for any more security for the loans he had made, than my property, which he held through Dow's conveyance. I never saw the time that I would take less than $10,000 for that property. Myers never paid a cent of his indebtedness to me. From the best information I can get he is dead.

*Cross-examined.*—I think I was not liable for any of the April or August, 1856, notes, through my name on the notes, but I had given security for these notes. My impression is that I did not sign any of the notes that have been testified to. I got Dow to sign them for me; he gave his notes for me. My name was not on the $2426,49. That note was

made payable to Gerry. I did not say Dow indorsed it. Previously I got Dow to indorse the John Myers note for $2400. I think it was made payable to Gerry. Dow did indorse it at my particular request for my benefit, with the bonds, to make Myers more certain to pay it. I think he did. [Note shown, $2426,49, July, 1857, payable to Elbridge Gerry.] I think that is the note. I say I don't recollect that I saw him indorse it; it was my request that he should do it, and that was the understanding that he should, because we wanted to make Myers more sure to pay it. The bond was left for my special benefit. Gerry had nothing to do with the note or bond. It was made payable to Gerry because Gerry advised me so. He advised me to let it be payable to himself and let Hiram H. Dow indorse it. I could not get a settlement with Myers, because Gerry would not give me up the note. I got Myers to sign it and carried it to Gerry. F. W. Robinson wrote the note. I think he carried it to Gerry with the bonds. It was understood by Robinson, Gerry and Dow, that that was for me. I had Gerry's honor to show that the $2426,49 was mine and not his. He was my adviser and counsellor. It was left in Gerry's hands so that Myers would pay it to him. I don't know about the few cents difference in the two notes. That note was given for the amount I owed Gerry. I had given him a deed of my property to secure him. The note was written by Robinson at my request. I directed him how to write it. I directed him to make it payable to Elbridge Gerry; I am not positive. I supposed Gerry would give it to me, but he did'nt. The $2426,49 was all that Myers owed me *on this matter*, but it was not all he owed me by $30,000. He took Gerry's receipt for the bonds and gave it running to Myers and Myers gave it to me. I have got the receipt here.

That matter has not been adjusted.

That $6000, or more, is behind yet. Dow gave his note for $2427. I would not say it was the same time. It was for the same debt and about the same time. I got all this

money for myself to loan to Myers. When I applied to Gerry for this money I told him it was for Myers. F. O. J. Smith was one of the counsel; I don't know but what he was the only one.

As to what it was that Dow indorsed for Myers, when, at the same time, he gave his own note for the same:—I got Myers to give his own note for the amount of money that I let him have, and got him to put up $4000 bonds as collateral; got Dow to indorse, so as to make Myers more sure to pay it for my benefit. Myers gave his note for the same amount, because it was the amount of Myers' indebtedness to me. Myers gave his note for what I owed Gerry; he gave his note for more money than he received. I raised this money for Myers at Myers' request. The notes were signed by Hiram H. Dow, because Gerry would not take my notes, and would take Dow's. Dow and I are cousins, and married sisters; he has indorsed for me more than $200,000. He had nothing but my word; he called it good, and it is now. I had his honor to deed back to me if I cleared it. The Porter note I got Dow to sign; he never signed any note for Myers.

*Cross-examined by Mr. Gerry.* — I should think very likely that I applied to you several times before you consented to take that $500 note; I do not recollect anything definite about it. You gave me the money for that note in your office. After the first note I recollect there was something said about a widow woman furnishing money. I afterwards learned it was Luther B. Dow's widow. I was sometimes present at the renewal of the notes and sometimes not; they were sometimes renewed a few days before payable, to please you. I never knew you to indorse Dow's note in my life. I could not recollect that you refused Dow's note; I thought you were rather fast to get it. In case of renewals you always spoke to me invariably. I always went to Dow and he renewed them at my request, and nobody's else. I don't know how much money I obtained on the 18th of August, 1856.

I conveyed this property to Hiram H. Dow a year or two before these notes were given. I think it was not till 1855 or 1856 that Dow began to sign notes at my request, for Myers' benefit. I sold it out-right to Mr. Smith, for $6000, because I was obliged to pay you the money. I could sell it to-day, if I· owned it, for a good deal more than that.

*Direct.* — I myself received the money of Gerry, at the different times the loans were made. Myers had never anything to do with it. I never had a cent security from Myers for any money that I loaned him, until he gave these notes secured by the consolidation bonds.

*Elbridge Gerry*, the defendant, called for the defence, testified : — Sometime just prior to June, 1855, Holmes came into my office with John G. Myers, and introduced him to me. · Myers stated at that time, that he wished to procure a loan of money, and desired me to assist him in procuring that loan of money ; he wished to procure the loan of money upon a claim that he then had against the York & Cumberland Railroad. After conversing with him, I told him I was willing to assist him, and asked him what he desired me to do ; he requested me to go to Portsmouth and Boston and see if I could raise some money on this security. I went to Portsmouth and Boston for the purpose of trying to negotiate a loan for him. I failed to get any money, and frequently from that time to the 25th day of April, 1856, Myers, and Holmes for Myers, made application to me to assist them in some way to get some money. Finally, about the 25th day of April, 1856, Holmes and Myers, or Myers alone, came to me and made a very urgent request that I should do something by which they could obtain a small amount of money for the purpose of a railroad lawsuit, his lawsuit with the St. Andrews Railroad. The particulars were stated to me at the time, and they made the case a matter of such necessity, and Holmes so pressed the matter, as a friend of Myers, that I understood it to be a great accommodation if they could get some money. Finally, I consented to in-

dorse a note for $500. I so told them that I would indorse a note for them and see if the money could be obtained at the bank. I indorsed the note. I think I carried it to the bank myself, but I am not certain about that, at any rate, it was carried to the bank and the money was obtained at the bank on that note. The note was discounted at the bank, and, from the money that was obtained at the bank, I deducted one per cent. for my indorsement of that note, and this was assented to by Myers and Holmes, and they were very much pleased to obtain the money on these terms. I told Holmes and Myers both, that I had no money of my own, that I could possibly loan or furnish.

The money was obtained at the bank and delivered to these parties after a deduction. I don't know to whom. I don't recollect. It was delivered either to Holmes or Myers. I don't know which of the men, but know they were both together. Just before this note became due Myers applied to me again and wanted some more money, and wished me to indorse Dow's note again and get some more money. I finally indorsed three notes of Dow, two for $600 each, and one for $623 ; these notes, two of them, were indorsed by me and the money obtained out of the bank, as before, the other was indorsed and delivered to Mrs. Luther B. Dow and the money obtained of her ; a part of that money was appropriated to pay the note that had previously been given, when it matured, the note of April 25 ; the balance I delivered to Myers himself, in my office. One per cent. for my indorsement was assented to and was agreed to, which made the interest on the note, so far, about 1½ per cent. on the notes. The note which was delivered to Mrs. Dow, was renewed from time to time, with my indorsement, up to July 18, 1857. Mr. Dow made a new note, I indorsed it, handed it over to Mrs. Dow, and she gave me up the old note. I do not distinctly recollect how often these notes were renewed. I have no minutes of these notes, they were renewed on all occasions just before they became due ; I state the renewal was procured just before due, with the view that they might

be negotiated to meet the payment of these notes. The reason why the old notes were left in my hands is that I had not the notes at the times the renewals were made, that I obtained the notes after the renewals were made. I cancelled them and laid them away, that's the reason they were left in my possession and not given up to Mr. Dow; he never called for them, if he had, I should have given them up to him.

The $600 notes of August, 1856, were discounted at the bank. After that time they would not take Dow's note at the bank at all. I failed to get Dow's note discounted at the bank. The other two notes I got Mr. J. J. Brown to negotiate with my indorsement upon them, and he carried those notes along by renewals up to July, 1857, the time the mortgage deed was given, at any rate, with my indorsement.

I paid Mr. Brown one per cent. for the money. I took one per cent. for my indorsement. I never charged a cent over that; sometimes I think it was less, but never in no instance whatever did I charge over that.

Previous to July, 1857, I began to feel very uneasy in regard to Dow's notes; they were very difficult to negotiate at that time, and I called upon Dow and Myers to tell them that these notes must be settled up in some way, that I wanted to get my name off from them, or have them secured. I saw Myers and Dow in regard to the matter, and have no doubt that I talked to Holmes in relation to it. Finally, Myers and Dow, and Holmes, perhaps. I did not call upon any of them except Dow, because he was the only man I had any legal claim against up to that time.

Finally, it was proposed that Myers should give his note for the money that had been procured on the previous note, and was to pledge, as collateral to his notes, $4000 of York and Cumberland bonds, and that, also, Dow should give his notes for the same amount, and give a mortgage deed of the place that he then owned in Westbrook, and,

that the mortgage and the notes should be held as collateral to Myers' note and bonds.

That arrangement was carried out, that was about July 18, 1857. Both of those notes were left in my possession; both notes were given to me and I was to hold them as security for the debt, but, of course, if Myers' note was paid that relieved the other notes; there was a slight discrepancy between these notes. I recollect distinctly the difference was, that I paid for the recording of the mortgage deed, and that was added into Dow's notes. This note embraced all the money that had been obtained for Myers up to that time, but I want to state here in connection with this, that sometime between the first loan and the last, I had let Myers on his own note have some small amount of money. It was in the neighborhood of $200, and I think it was $250. The amount I have not got. It was in the note of July 18, 1857. That was also embraced in the Myers' note. It was lent money with no interest of any kind charged. Nothing was embraced in that settlement except what was against Dow and Myers.

Soon after this transaction of July 18, 1857, Dow told me he had been sued on one of these Myers' notes, as he called them, and he wanted I should settle it. In the first place he wanted me to pay that note and another note of some $300 or $400, I do not recollect the precise amount. I declined to pay the other note, but finally told him, if he would give me a quit-claim deed of the property, I would pay this note and interest and cost upon it. That was the deed of the place in Westbrook that I had a mortgage on. The deed was made, delivered to me, and I paid the note, interest and cost, to E. L. Cummings, who had the note in his office and sued it. About the notes in the mortgage,— nothing was said about them, one way or the other. I told Dow, at the time, that I did not want the property, at any rate whatever, nor at any price; it was not property that I wanted. I told Dow that the reason that I wanted a quit-claim deed, was to prevent this from being a mortgage.

Holmes *v.* Gerry.

Either at that time, or subsequently, I told him that I was ready, at any time, to give any third person a writing or bond, any one he might suggest, to convey the property on payment to me for what I had already procured for him on the notes. For the amount of the notes and the money I had paid out.

Holmes and Dow came to my house, into my room where I was confined, and my brother, John C. Gerry, was there with me. Dow remarked, when he came in, that he had come up to see about our affairs. He replied that the notes had been paid by the quit-claim deed. I told him I did not so understand it, that I supposed he was to take up the old notes by payment, or else, if they were not taken up, there were to be new notes, and I was to give a bond to some third person *that*, when these notes were paid, the property should be conveyed. I mean the mortgage notes and the $500 Porter note.

Mr. Dow repeated, in words, that the notes were paid, that the property was mine, and, not only that, but the bonds that I had as collateral; that was really what the controversy was about, that was spoken of here, by Holmes, yesterday. The bonds were relieved and he wanted the bonds. Said I, Mr. Dow, you consider this property unconditionally mine. He said yes. I asked him who was to pay me rent of the property since the quit-claim deed had been given. Holmes was present in the room and heard the conversation. Dow replied, he supposed the man who occupied it, and looked to Holmes and smiled. I then turned to Holmes directly, and asked him if he so understood this transaction, that he was to pay me rent, or the property was mine. He said he did, and replied that he was ready to quit the premises at an hour's notice. I then said, Mr. Holmes, I then notify you on the spot to quit those premises forthwith, and immediately Dow and Holmes left, and, from that time forward, I treated that property as my own, and in no other way.

A few days after that, I saw Myers and Holmes together,

Holmes *v.* Gerry.

and then I communicated to Holmes that Myers had pro-
posed to me that, if I would let him remain there on the
place, not turn him off, as I had notified him to quit, that
the bonds should remain as collateral security for the rent,
that he would allow his bonds to remain as collateral securi-
ty for the rent. We did agree to that arrangement until I
returned, until some future arrangement was made between
Holmes and myself. Holmes and I then agreed that the
rent should be $300 per year. That is the reason why the
rent runs back a year behind the paper. It goes back to
the time that Holmes and I agreed upon the price of rent.
It was agreed to be $300 per year.

I went to Virginia and was gone some months. I return-
ed in the fall of the same year, 1860. Matters remained
in this state until August 18, 1861. Holmes came to me
and proposed to buy the place of me, and I was exceeding-
ly anxious to sell it to him or anybody else.

We subsequently made a contract in writing; that's the
contract of August 18, 1861. Holmes and Dow stated that
contract was given up; there was no giving up about it, he
had one and I had one, the amount named in that is the con-
sideration, the amount to be paid was made by adding the
rent of the property, from the time of the quit-claim deed
up to that time, and I made Holmes a liberal discount from
the rent at that time.

The next transaction that I had with Holmes occurred in
May, 1863. I had several small notes against Holmes and
an unsettled account against him for professional services,
and I had also a $500 York and Cumberland bond,, which
he had left with me as collateral on these small notes, my
accounts were getting outlawed and the notes were getting
outlawed, and I called upon Holmes to come and settle them
up. We settled the professional account, we cast the inter-
est upon the small notes, and the amount of the notes and
interest was added to what I agreed to take for the profes-
sional account, and the two sums together, the notes and
the professional account, was put into a new note of $732.

The account was $500, and the notes and interest must have been $232. All the demands and claims Holmes then had against me were settled and cancelled, of every name and nature, and a receipt in full of all demands, was taken at that time. I have one somewhere. "Portland, May 22, 1863. Received of Elbridge Gerry one dollar, in full of all demands. John A. Holmes." This $500 bond was to be mine. I was to sell and dispose of it, at my own election. I was to appropriate the proceeds of it upon the payment of this $700 note. The bond was pledged to secure the small notes, collateral to the small notes which were put into the $700 note.

At this time it was agreed between us, that I was to sell the $5000 bonds just when I pleased, and as I thought best, and, whenever I did sell them, the proceeds of them was to go towards the rent on that place. In pursuance of the original agreement of Myers, to apply the proceeds to the rent. It was left entirely with me. Holmes stated, over and over again, that I could dispose of the bonds whenever I pleased, and as I pleased, without any sort of reference, one way or the other, to Myers or himself. I did'nt choose to do that way; I wanted to avoid any question, but, for the purpose of settling all the difficulties in regard to what the bonds might be worth, I caused them to be advertised and sold at public auction, giving thirty days notice, or more, in the newspapers of this city.

I caused them to be sold, and authorized Robinson, who was a broker, if the bonds went less than a certain sum, it was less than twenty per cent. some eighteen per cent. on the bonds, that if he would buy them in and did'nt want to keep them at that price, I would take them off his hands. I think it was eighteen per cent. They sold for less than the sum named, consequently he bid them in. He bid them off at any rate. Robinson bid off the bonds, and kept them until this assessment was made a year ago last October, I think, and then turned them back upon my hands.

I showed Holmes the account of Bailey's sales. Some

days previous to July 5, 1864, Holmes came to me and said he wanted to buy that property out there, and square all the claims that I had against him. I told him I would sell it to him and should be very glad to settle up with him. In a day or two he called, and I had in the mean time taken the rent on the place, at $300 a year, and cast the interest on it at six per cent. at the end of each year in succession.

I have the original paper, upon which the final settlement was made; the rent and the interest, from the date of the quit-claim deed, to the day I sold it to Holmes, amounted to $2517,40. I called the insurance during that time $100 for seven years, for what I paid out. The $732 note was computed at six per cent. and no more, and amounted to $783,67, and Gerry and Robinson's bill for professional services was $208,81. The items amounted to $3609,88. From this $3609,88, $757,73 was deducted, which was the proceeds of the sale of all these bonds, $5500 of them. After deducting $757,73, it left a balance due me of $2852,15, that was the amount due from Holmes. That $100 was put in as a basis of the sale, but it was not an indebtedness from him to me.

Now add the real estate to it, $3147,85, that's what I called the real estate at the time, and that makes an aggregate of $6000. I had previously offered to sell this to Holmes for just what it cost me, but I told Holmes at that time, that I could not then sell him that property so cheap as I could years ago, for the reason, that the horse railroad had made it more valuable, and also, if I took my pay in currency, that I could not take the money and invest it in any other property without a great loss. This property, at the time it came into my hands, at the price it cost me, at $3000, was property that I did not want at that price. I have called it in round numbers $3000.

He looked the figures over; he looked them all over at the time and never made the slightest objection to the amount of the sale of these bonds, but what it was all right, acquiesced in the manner in which it was made, as being in

conformity with our original agreement, and in pursuance of that, Dow gave that receipt which was shown here yesterday, in full. As one of the bonds came directly through 'him (Dow) and my wife wrote a duplicate receipt for Myers to sign, of precisely the same character. When he did that the thing might be closed up. He took that receipt and promised when he went away to get Myers to sign it or return the receipt to me. Upon that condition I was to give him up the Myers note. The reason why that note was not given up at the time, was because he had no orders from Myers for it; I was not authorized to do it, that was the reason the note was not given up at that time. He never brought me the order nor never brought me the receipt back. Hiram H. Dow was with him when the sale was consummated. The payment was made by a certificate from the cashier of the Mechanics' Bank, that Hiram H. Dow had deposited $6000 to my credit. John Holmes' name was not mentioned in it.

At the time I took the mortgage, July 18, 1857, I was on the $809 notes. I procured the money to take them up of Richard Jenness, of Portsmouth, N. H. I borrowed the money of him, every dollar of it; with the exception of the small notes that I have testified about. I have never loaned any money to John A. Holmes during 'the periods of time that have been testified to. I might have let him $10, $20 or $40 for a few days. From April 25, 1856, to July 5, 1864, I have no recollection of loaning him any money where I had any security. I lent him no money, that has been mentioned in this transaction, during this period of time except the small notes.

I will state as a fact that occurs to me, that, when the deed was made to Holmes, the deed of July 5, 1864, he wanted me to put the consideration at $10,000. I told him it was absurd and I would not do it, but I finally consented to call it $5000 and the consideration was merely arbitrary, without any reference to what was paid.

John A. Holmes' name I never had on one of the notes

from April, 1856, to July, 1857. I never knew him in the transaction except as a friend to Myers and Dow. At the time this conveyance was made, this account of Gerry and Robinson, was settled. The $732 note was given up. Hiram H. Dow's receipt was given at that time, when the deed was given, in Holmes' presence.

Much other evidence was put in. Agreement " A." was as follows : —

" I, Elbridge Gerry, hereby agree to release to John A. Holmes, all my title and interest in and to the real estate conveyed to me by H. H. Dow's deed, dated Aug. 8, 1857. Also deliver up to him three several notes signed by said Dow, dated July 18, 1857. Also deliver up to him, on the order of John G. Myers, and the surrender of a certain receipt given by said Gerry to said Myers, for certain York & Cumberland Railroad bonds, the note of said Myers, dated July 18, 1857, and four bonds of $1000 each, of the York & Cumberland Railroad, called consolidated bonds. Also give up to said Holmes one other note signed by said Dow, dated June 27, 1857, and a $1000 York & Cumberland consolidated bond, upon the following conditions : —Provided always, that the said Holmes shall pay to said Gerry $4180 and interest, within six months from the date hereof, and also all taxes now assessed or that may be hereafter assessed on said premises, and all money paid hereafter by said Gerry for keeping the buildings insured on said premises, and also produce the order of the said Myers for the note of the said Myers before mentioned, and also for the four one thousand dollar bonds before mentioned, and cause to be surrendered to the said Gerry the receipt before mentioned, given by the said Gerry to the said Myers, for four of the bonds aforesaid, all of which conditions the said Holmes hereby promises and agrees to perform and fulfil, as conditions on his part.

" And it is further agreed and understood by and between the said Gerry and said Holmes, that in case the said Holmes shall fail to pay the money as aforesaid, and per-

form the conditions as aforesaid, that the said Holmes shall pay as rent for the use and occupation of the premises aforesaid, at the rate of three hundred dollars per annum, said rent to be paid from and after the first day of May, A. D. 1860, so long as the said Holmes shall continue to occupy the said premises, and the tenancy of the said Holmes shall be regarded as terminated on the performance of the conditions or the failure to perform the conditions to be performed on his part, as before mentioned.

"PORTLAND, Aug. 18th, 1861.

"Elbridge Gerry,

"John A. Holmes."

The verdict was for the plaintiff, for more than was claimed, whereupon the plaintiff filed a *remittitur* for the excess.

The defendant alleged exceptions to the ruling allowing the amendment.

*Gerry, pro se,* and with him *J. & E. M. Rand.*

*B. Bradbury,* for the plaintiff.

KENT, J. — The only exception to the rulings of the Judge is that he allowed an amendment of the eleventh count. The rule on the subject of amendments is now very broad, and gives great discretion to the Judge presiding. Where the proposed amendment clearly describes and introduces a new cause of action, exceptions will lie to the allowance of such amendments.

The original eleventh count sets forth a claim to recover back money paid as usurious interest to the amount of twenty-five hundred dollars. The amendment does not enlarge this claim or change its nature, or the cause of action. The original count sets out that, before a certain day named, the defendant had, at different times, loaned to the plaintiff large sums of money, amounting in all to three thousand one hundred dollars, and on that day did take and receive the excessive interest. The amendment sets forth in detail and specifically the various loans and their dates, but does

not enlarge the claim for excessive usury. It does set out a large number of loans, — but most of them as renewals of former loans. . The amount of the actual loans paid in money does not appear to exceed the sum stated in the count. And if it did, it would not apparently change the real claim set out in the count, which does not depend so much upon the sum loaned, as on the rate of interest. The gist of the count, as originally drawn, was that the defendant had received of plaintiff twenty-five hundred dollars as excessive interest, on loans. The amendment sets forth the several loans, and the interest paid on each, but reduces, by its specific declaration, the whole sum claimed as usury, paid to the defendant.

We think the amendment was properly allowed.

The defendant filed a motion to set aside the verdict as against evidence and the law as given to the jury, — and urges upon us several grounds for the maintenance of his motion.

The verdict, as it stands, is confessedly wrong. It is for more than is claimed in the declaration, and the plaintiff's counsel admits that it is so, — to the amount of something over one hundred and sixty dollars. He suggests that he is willing to remit that sum. This is often done, where it is clear that an unintentional mistake has been made by the jury, and that the party is entitled to a verdict in his favor, and the amount is a matter of mere calculation, and not seriously in dispute. But it does not follow, as a settled rule, that in every case where a jury gives all that is demanded and something beyond, that the verdict may be amended by a remission of the excess. This must depend upon the facts in the case, and the judgment of the. Court in view of the whole evidence.

An error like this, if not fatal to the verdict, yet suggests that there must have been some mistake, misapprehension, or carelessness on the part of the jury, — or possibly some bias or prejudice, inclining them to swell the verdict, even beyond the claim of the plaintiff. At least it, to some ex-

tent, weakens its force as a *veredictum*. The defendant contends, if he is liable at all, that he is not liable to the full extent of the claim, and he contends that it would not be just to assume that, although the verdict is confessedly erroneous, because for too much, yet it should be taken as certainly correct up to the amount claimed.

But the defendant further claims that the verdict for any amount against him, is unsupported by the evidence and the law. He says that *this plaintiff* cannot recover back money paid, even if any one else could, because, he says, he was never a debtor of the defendant, and never stood in that relation to him.

The evidence in the case is very voluminous, but the points on which it turns are few. It is clear that, in order to sustain the action, the proof must establish the *last* allegation in the eleventh count, after the amendment was inserted. That allegation is that the defendant, on *the 5th of July*, 1864, in a certain contract *then* made between the plaintiff and defendant, in substitution and renewal of a former contract of loan, and for money advanced *by the defendant to the plaintiff*, did take and reserve, and receive in money of the plaintiff, — to wit, the sum of six thousand dollars, on the said previous contract, (of 1861,) a rate of interest exceeding that allowed by law by the sum of $375,98. In the preceding allegations in this count, a large number of contracts is set forth, on which it is declared the defendant had taken and reserved usurious interest. But all these were more than one year before this suit was commenced, and therefore apparently barred by the statute. But the plaintiff avers that all this excessive interest was actually paid on the 5th of July, 1864, in and by the $6000, and that was within the year. There is no question that the plaintiff did pay the defendant that sum on that day. The Court very properly instructed the jury that the cause of action accrues when the excessive interest is *paid*. *Furlong* v. *Pearce*, 51 Maine, 299. The question then was

whether the plaintiff paid the defendant excessive interest on that day.

The Court instructed the jury, (and his rulings on this point seem to have met the approval of both parties,) that the plaintiff must set out and prove a loan to him, or contract between the plaintiff and defendant, and that, on that loan or contract, so proved, excessive interest was retained or received by the plaintiff; that it must be a loan made by the defendant to the plaintiff, and the excessive interest must be received *from him* on that loan, and that it must be a *loan on which the plaintiff was legally liable to the defendant.* This is clearly correct according to the authorities.

It is to be observed that this action is to recover back money paid as illegal interest. It is not a case, where the lender attempts to recover on the promise or contract, in which usury has been reserved or received. Formerly such usury rendered the whole contract voidable or void. And there are many cases, under this provision of the law, where questions arose as to the rights of parties to the instrument sued to set up this defence, although the actual borrower, who made the agreement to pay usury, was not himself on the note. But those actions were based on the agreement, and the defendants were bound on the notes declared on. But it has never been decided, so far as we have examined the cases, that any one, not a party bound to pay, who pays voluntarily a note or debt, which is wholly or partly for excessive interest, can recover it back in an action in his own name. The following cases, more or less directly sustain the rulings of the Court. *Boardman* v. *Roe*, 13 Mass., 105; *Gray* v. *Bennett*, 3 Met., 529; *Stanley* v. *Kempton*, 30 Maine, 119; *Brickett* v. *Minot*, 7 Met., 291; *Stevens* v. *Lincoln*, 7 Met., 525; *Billington* v. *Wagoner*, 33 New York Rep., 31.

In examining the evidence as reported, it is clear, and not disputed, that the plaintiff was at no time a party on any one of the notes or the renewals. He was neither maker, indorser or guarantor. He was never the legal debtor of the

defendant, unless he was so outside of the notes and written contracts. He never made any written contract, signed by himself, by which he bound himself to pay any of the notes. Paper A does not bind him to pay, except at his option.

What was his relation to the defendant, on the 5th of July, 1864, when he paid him the $6000?

Was he under any legal obligation to pay the defendant anything? Could the defendant have maintained any action against him for money before loaned, on that day?

It is clear that the defendant could not maintain any action against Holmes, the plaintiff, on any of the notes, for he was no party to them. Nor could he maintain any such action on the agreement of the 18th of Aug., 1861. (Paper A.) That was an agreement to give a deed of certain property and to deliver up certain notes and papers, on condition that the plaintiff paid him a certain sum in six months. This he did not do, and therefore no action could be sustained on that paper. That paper contained no promise to pay.

The substance of the allegations in the count relied upon, as well as we can gather them, is that, before the 18th of August, 1861, the defendant had loaned the plaintiff certain sums of money, on certain notes of Myers and Dow, which had been renewed from time to time, and each including excessive interest; that the loan was to the plaintiff and the notes were but security.

He then alleges that, on the said 18th of August, in and by a certain contract made and entered into by plaintiff and defendant, (A,) defendant did take and receive excessive interest of plaintiff, to the amount of $625,53.

But this was more than one year before suit. To bring the actual receipt of the money for such illegal interest within the year, he finally alleges that, on the 5th of July, 1864, in another contract between plaintiff and defendant, in substitution and renewal of and to carry out the last named contract, and for money advanced, he did then and there

take, reserve and receive, in money, of the plaintiff, in the sum of six thousand dollars, a rate of interest exceeding that established by law, by the sum of $375,98, in addition to the sums of unlawful interest before named, making in all $1574,90 usurious interest, at the times named; and the plaintiff alleges that he in fact paid the said sum of money ($1574,90) in the $6000 *paid that day.*

As to the original loan :—Was this plaintiff the debtor or liable to the defendant? It is certainly remarkable, if he was, that he should not have been a party to any of the notes, from the beginning to the end. If he was the debtor, and these notes but collateral security for his indebtedness, it would seem singular, at least, that no note, bond, obligation or writing of any kind from him should have been given or taken. There can be no doubt that the plaintiff was active and interested in the negotiations for obtaining money for the use of Myers. But was he legally bound to pay the defendant? Is it shown that the defendant loaned money to him, and looked to him as his debtor? Whatever arrangements might exist between the plaintiff and Dow and Myers, the plaintiff could only become the debtor of the defendant by his assent or agreement. The defendant testifies that he never lent any money to Holmes on these transactions.

Myers, whose deposition was taken by the plaintiff, although used by the defendant, testifies that he received all the money and that plaintiff did not, that Holmes negotiated for him. There was evidently considerable looseness and indefiniteness in the transactions. But it is to be remembered that the point here is, whether the plaintiff was a party to any of the contracts in which excessive interest was reserved or taken, so that the defendant could call upon him for payment and, if refused, enforce it by suit. We confess that, after a careful examination of the evidence, we think that there is a failure to establish the proposition by a preponderance of testimony. It was ruled by the Judge that, if the contract was for indorsement by plaintiff

only, the action based on illegal interest could not be sustained. The evidence as to the first note, if not as to the others, seems to look as if that was the contract.

However this may be, there seems to be wanting that amount of evidence which, in the absence of any connection of the plaintiff's name with the notes, would establish "any loan on which the plaintiff was legally liable to the defendant."

Again, the only payment made was the sum of six thousand dollars, on the 5th of July, 1864. What was that for? Was any part of it in fact paid and received as excessive interest on prior loans. The defendant says that it was not, and that, even if it had been paid by Dow or Myers, who were on the notes, yet that it could not have been recovered back as illegal interest received on a contract or loan. He also contends that, if a party to the loan or notes could have recovered it, yet that this plaintiff could not, even if it was a payment of the notes, which included illegal interest.

It seems to be well settled that, if a third party, not bound himself to pay, voluntarily pays a note given for usurious interest and takes the note up, *he* cannot recover it back, unless he pays it as agent for the promisor, or under an agreement with the promisor to pay it for him. As where a mortgage is assigned and the assignee agrees to pay the balance due on the note secured by mortgage, which is usurious. *Cunningham* v. *Hall*, 7 Gray, 559; *Stanley* v. *Kempton*, 30 Maine, 119.

Now, if the notes of Dow and Myers *were* outstanding on the 5th of July, 1864, and the plaintiff, not being held on them, paid them voluntarily, *he* cannot recover back the part which was usurious.

But, were they in fact outstanding and due and in legal force on that day, against any one? It seems very clear, on the whole testimony, that the notes were virtually paid and cancelled when the absolute deed was given in July, 1857. This is the testimony of all the parties, and it does not seem to be controverted that, on the 5th of July, when the $6000

were paid, there were no existing valid notes to be paid or enforced. But the defendant had taken a quit-claim deed of the land from Dow, to whom Holmes had conveyed it, in lieu of the mortgage before given. The defendant says this was in full payment of all his claims, and that thenceforward he was the absolute owner of the estate, and the other parties were released from their indebtedness to him. The plaintiff, however, insists that this was a mere change of security, and that the land was substituted as security for the original loan to plaintiff, instead of the notes. That is, following the idea, that the loan was to the plaintiff and he was the debtor, and the notes only security or pledge for that debt, — that, under the new arrangement, land was substituted as security and the notes given up. We have before spoken of the unusual mode of transacting business, if the plaintiff was the original debtor.

But this would seem to be still more remarkable. The defendant had a mortgage to secure these notes, of the same real estate, conveyed to him by Mr. Dow. He had then the notes and the security by mortgage. The assumption is, that he gave up the notes, and changed the form of the security only, by taking an absolute deed in lieu of the mortgage, but regarding it only as security and to be in effect a mortgage. Why should he do this? And more especially why should he give up all the written evidence of indebtedness and release his debtors, and not take any note or bond or written contract from the plaintiff? Why leave all his debt against any one to rest, at best, on verbal testimony, relating to the mixed matters between all the parties. Do men usually take a mortgage to secure a loan without taking a note? Would a man be likely to change a mortgage, which clearly defined the notes secured, and give up those notes and take an absolute deed as security only, leaving it to parol testimony to show for what it was security.

The paper A does not refer to his holding as for security only. In its form and apparent purpose it is such an agreement as one holding the absolute and unconditional

title to real estate would give to one who desired to purchase. It does not provide that, upon payment of the sum due on certain notes held, as in force, but, upon payment of a certain sum named and interest from date, within six months, and all taxes and insurance *hereafter*, the defendant agrees to release all his interest in the real estate. It does not say that Holmes *owed* the defendant that sum and upon payment of *his debt* a release should be executed, as in case of a mortgage. It is left entirely optional with Holmes to pay the price fixed or not. If he did not, the title to the property would remain as before, in the defendant. See, as bearing somewhat on this point, *Fales* v. *Reynolds*, 14 Maine, 89.

It may be that, in fixing the price or sum to be paid, the defendant had more or less reference to the amount which would have been due on the notes, if they had remained in force. But that would not establish the fact that this plaintiff or any one was still his debtor. It is not unusual for a person who has taken real estate in payment for his debt, to fix the price for which he will sell it or reconvey to its former owner, by reference to the sum and accruing interest, which it represents and stands in lieu of, in his calculations. And if, in making that mental calculation, he includes extra interest, which was reckoned in the notes paid and discharged by the real estate, and the new purchaser pays him his price, thus fixed, it could hardly be seriously contended that any part of the price paid could be recovered back by any one, as excessive interest received.

The condition in this paper A, in reference to rent to be paid by plaintiff, in case he did not choose to pay the price fixed, corroborates the idea that both parties regarded the absolute title, free from any subsequent claims, as in the defendant.

It is not questioned that, if the real estate was given and received in payment of the notes, which included illegal interest, and that, if any action could have been maintained to recover back such interest, where the payment had been

made in real estate, yet that such claim in this case was barred by the limitation of one year in the statute.

In fact, this absolute deed was given in 1857. There does not appear to have been any attempt to enforce those notes by suit. There were no renewals after the deed was given. It was evident that, for a time, the defendant preferred that his loan and interest should be paid, rather than hold the real estate in payment. But we fail to see any evidence that either party really claimed that the notes were in force and not discharged. The conduct of the parties was inconsistent with the idea that the last notes, on seven months from July 18, 1857, were in force. If they were, why were they not renewed or sued?

The allegation in the writ is that the last agreement, when the $6000 was paid, was in substitution and renewal of, and to carry out the contract of Aug. 18, 1861. (Paper A.) If so, we are met by the same objections, which have been stated, that there was no actual debt due, or which the plaintiff was bound to pay to the defendant. This was the only money paid. As before shown, it could not make the transaction usurious, if the defendant, in fixing the sum for which he would release his title to the real estate, chose to have reference in his calculations to former transactions, unless there was a payment of the loan by a party bound to pay it.

We will add but a single further suggestion. If Holmes was the debtor of the defendant, he became so, either at the commencement of the transaction, or when the absolute deed was given, and the notes (which he now claims were mere securities) were paid by the real estate.

In either case, the claim against him would have been barred by the general statute of limitation of six years, at the time he paid the $6000. It is true, a man may properly pay a debt thus barred, and may recover back usurious interest so paid. But it is certainly a remarkable fact, if he was in truth the debtor of Gerry to the whole amount, that he should never have been called on to give his note or any

written evidence of indebtedness, or to renew his promise, or to pay accruing interest from time to time, and that his creditor should have allowed six years to elapse without any attempt to enforce his claim.

On the whole, we think that this verdict, under the evidence before us, ought to be set aside.

*Motion sustained, — Verdict set aside,*
*and new trial granted.*
*Exceptions overruled.*

APPLETON, C. J., WALTON, BARROWS and DANFORTH, JJ., concurred.